# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

TRACY TRITTIN,

     Plaintiff,

    *vs.*                                CAUSE NO.  1:13-cv-1701-DKL-SEB

CAROLYN COLVIN, **Commissioner of Social Security,**

     Defendant.

## ENTRY

The Commissioner of Social Security denied Tracy Trittin's applications for disability-insurance and supplemental-security-income benefits under Titles II and XVI of the Social Security Act.  Ms. Trittin now sues for judicial review of that denial.

## Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that

1

Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B). 20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966. The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. ▪§ 423(d)(2)(B) and 1382c(a)(3)(G). 20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. ▪ 404.1525. If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy,

together with any additional non-exertional restrictions. At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. ▪ 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level. Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v.*

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. ▪ 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## Background

In her applications, Ms. Trittin reported that she suffers from fibromyalgia, a heart condition (possible bradycardia), nausea, and asthma.  (R. 182, 215.)  Later, she alleged

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (▪ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

that she suffers from chronic obstructive pulmonary disease, migraines, and pain disorders, as well. She asserts that she suffers nausea, vomiting, dry heaves, diarrhea, irritable bowl syndrome, fatigue, and weakness as side effects of her fibromyalgia, which render her unable to maintain the stamina, persistence, and pace to perform substantial gainful activity. At most, she contends that she could perform a part-time job two to three days a week, lying down every day. (*Brief of Plaintiff* [doc. 28] at 5-6.) Ms. Trittin has been represented by current counsel from her application to the present. (R. 215.)

Ms. Trittin's claims were denied on initial and reconsideration reviews, (R. 87-108), and she received a hearing before an ALJ, (R. 38-86). Ms. Trittin, her boyfriend with whom she has co-habited for one and one-half years, and a vocational expert testified. Ms. Trittin's counsel submitted emergency-room notes on the day before the hearing, (R. 501-09 (Exhibit 22F)), and the ALJ held open the record to receive additional evidence, (R. 17, 41, 45-46, 48, 85).[2] After the hearing, Ms. Trittin submitted to the ALJ additional records from John Hague, M.D., rheumatologist, (R. 17, 522-62 (Exhibit 24F)), and Stephen R. Pfeifer, M.D., and staff, (R. 17, 563-672 (Exhibit 25F)).

At step one, the ALJ determined that Ms. Trittin has not engaged in substantial gainful activity since her alleged disability-onset date in March 2010. At step two, the ALJ found that she suffers from the following severe impairments: fibromyalgia, asthma/chronic obstructive pulmonary disease, bradycardia, migraines, depression,

---

[2] Records from Theodore Nukes, M.D., neurologist, that had been received earlier but not given an exhibit number by the time of the hearing, also were added to the record. (R. 17, 510-21 (Exhibit 23F).)

pain disorder associated with both psychological factors and a general medical condition, and history of cannabis use. The ALJ found that seizure, nausea, diarrhea, and hypertension are not severe impairments. At step three, the ALJ found that Ms. Trittin does not have impairments, severe and non-severe, singly or in combination, that satisfy any of the conditions in the listing of impairments. She examined the listings for chronic pulmonary insufficiency (3.02), asthma (3.03), cardiovascular system (4.00 series), affective disorders (12.04), and substance-addiction disorders (12.09).

For steps four and five, the ALJ determined Ms. Trittin's RFC. She found that Ms. Trittin has the RFC to perform at the sedentary, light, and medium levels of exertion with the following additional restrictions: she must avoid certain environmental conditions;[3] she can understand, remember, and carry out short, simple instructions; she can sustain attention for two-hour segments; she can tolerate contact with co-workers, supervisors, and the general public; and she can adapt as needed in work settings involving routine adjustments.

At step four, the ALJ found that this RFC prevents Ms. Trittin performing her past relevant work. At step five, relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs exists in the national economy with Ms. Trittin's RFC, age (younger individual age 18 to 49), transferability of skills (unskilled), and

---

[3] The ALJ found that Ms. Trittin must avoid concentrated exposure to humidity, fumes, odors, dusts, and gases, and she must avoid poor ventilation.

education (limited, with the ability to communicate in English). Therefore, the ALJ found that Ms. Trittin is not disabled and denied her benefits claims.

Ms. Trittin asked the Appeals Council to review the ALJ's decision and submitted additional records from Joseph Dominik, M.D., to it. (R. 6, 9, 10, 673-710 (Exhibit 26F).) After reviewing the additional evidence, the Appeals Council denied review, (R. 6), which rendered the ALJ's decision the Commissioner's final decision on Ms. Trittin's claims and the one that the Court reviews.

## Discussion

Ms. Trittin argues that the ALJ's decision is erroneous on several grounds.

**1. Failure to give controlling weight to the opinions of Ms. Trittin's treating physicians.** Ms. Trittin argues that the ALJ failed to give the controlling weight that was due to the opinions of her treating physicians Drs. Hague, Pfeifer, and Dominik[4] "in respect to Claimant's diagnosis of fibromyalgia" and, thus, "failed to give proper credibility to the severity and limitations imposed by the Claimant's fibromyalgia and the other conditions as a result of this impairment, namely frequent nausea, migraine headaches, irritable bowel syndrome and diarrhea." (*Brief of Plaintiff* at 6.) According to her, the ALJ "disregarded her primary impairment of fibromyalgia." (*Id.*) She concludes by asserting that "[i]t is clear from the testimony that the Claimant's fibromyalgia is a

---

[4] In her reply, Ms. Trittin added Drs. Nukes, Gupta, and Harris to the list of her treating physicians whose opinions were due controlling weight. (*Plaintiff's Reply to Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 36] ("*Reply*") at 3.) However, because this argument was first raised in her reply, it is forfeited.

medically determinable impairment and that she meets the criteria of 2010 under SSR 12-2p." (*Id.* at 15.)

Ms. Trittin fails to identify the specific opinions of her treating physicians to which she contends the ALJ failed to give controlling weight. Instead, she describes criteria for a diagnosis of fibromyalgia and the findings of these physicians showing that certain of these criteria were present, and she emphasizes that they all diagnosed her with fibromyalgia. But the ALJ accepted their diagnoses and specifically found that Ms. Trittin has the severe impairment of fibromyalgia; thus, she gave their opinions controlling weight to that extent. The ALJ's significant finding was that Ms. Trittin's *functional limitations* resulting from her impairments, including fibromyalgia, did not amount to disability and, with regard to this finding, Ms. Trittin fails to identify any contradictory opinions by her treating physicians. When the Commissioner pointed this out in her response — that diagnosis does not equal functional disability — Ms. Trittin replied by simply repeating her assertions that the ALJ "failed to acknowledge or recognize the severity of her fibromyalgia" and that her physicians have diagnosed fibromyalgia.

In her reply, Ms. Tritten adds that her physicians treated her for fibromyalgia and that "none of them disputed her allegations of pain, the severity of the pain, of migraines, of nausea and vomiting associated with any of the doctors' diagnosis [*sic*]." (*Reply* at 1, 2.) But her physicians' treatments of her fibromyalgia, while confirming their diagnoses, still do not address the degree of functional limitation caused thereby. In addition, the

*absence* of an opinion disputing any of Ms. Trittin's allegations does not constitute an opinion fully confirming her allegations.

The Court will not search through the evidence originating from Drs. Hague, Pfeifer, and Dominik for an opinion on Ms. Trittin's functional limitations to which the ALJ should have given controlling weight. If such opinions exist in the record, and they are helpful to Ms. Trittin's assertion that she is disabled, then the Court assumes that they would have been cited by her.

Ms. Trittin has not shown error in the ALJ's according of weight to her treating physicians.

**2. Miscellaneous errors.** Ms. Trittin includes some arguments under the previous heading that appear, instead, to be independent arguments.

**a. Prejudging RFC.** Ms. Trittin argues that the ALJ erroneously first determined her RFC and then evaluated whether the evidence of record was consistent with it, contrary to the holding in *Reindl v. Astrue*, No. 09-C-2695, *Memorandum Opinion and Order*, 2010 WL 2893611, *12 (N.D. Ill., July 22, 2010) ("[T]he ALJ's refusal to consider Dr. Katz's opinion to the extent it was inconsistent with the RFC the ALJ adopted puts the cart before the horse. the ALJ is not at liberty to first create an RFC and then disregard the evidence that may contradict it."). First, as a district-court decision, *Reindl* is not precedential or otherwise binding on this court. *TMF Tool Co., Inc. v. Muller*, 913 F.2d 1185, 1191 (7th Cir. 1990). Second, the Court finds no indication that the ALJ pre-

determined Ms. Trittin's RFC and then evaluated the evidence against it, in other words, that the ALJ "ignor[ed] almost all of the medical evidence and facts that contradict that RFC" and "basically ignored the medical evidence supporting the Claimant's fibromyalgia." (*Id.* at 12.) To the contrary, the ALJ's discussion reveals that she considered the evidence of record and arrived at an RFC based thereon. The ALJ's statements that, for example, nothing in the clinical signs suggests that her RFC is unreasonable, (R. 29), and Ms. Trittin reported activities of daily living that were not inconsistent with her RFC, (R. 27), are matters of phrasing and do not indicate a prejudging of RFC untethered to the record evidence.

Ms. Trittin asserts conclusorily that the ALJ ignored evidence of fibromyalgia and its effects and/or should have devoted more time to discussing her treating physicians' records. But, again, she fails to identify specific items of evidence in the record that the ALJ was required to explicitly address and the specific effects of that evidence on showing disability. She asserts that the ALJ failed to discuss the many pages of the physicians' reports regarding her fibromyalgia, including her trigger-point tests and the impairments side effects, (*id.* at 13), but, other than the trigger-point tests, she does not identify specific evidence in those reports that are significant enough to have required explicit address by the ALJ. Because the ALJ accepted the diagnosis of fibromyalgia as a severe impairment, it is not evident that specific discussion of the trigger-point tests was required.

Ms. Trittin has not shown that the ALJ prejudged her RFC, evaluated the record evidence against that RFC, or ignored evidence relevant to RFC.

**b. Dr. Bangura's opinion.** Ms. Tritten argues that the ALJ impermissibly diminished Dr. Bagura's opinion that she was unable to walk or stand for two hours, frequently lift or carry less than ten pounds, or occasionally lift or carry more than ten pounds. (*Brief of Plaintiff* at 14.) On request of the state agency, Luella Bangura, M.D., an internist, conducted a consultative examination of Ms. Trittin. (R. 25.) In her report of that examination, (R. 481-85 (Exhibit 18F)), under the heading "Medical Source Statement," Dr. Bangura recorded the described functional limitations for Ms. Trittin. (R. 484.) Ms. Tritten argues that the ALJ simply rejected Dr. Bangura's opinion because it was contrary to the ALJ's predetermined RFC, which the ALJ adopted from Dr. Whitley, M.D., a non-examining state-agency reviewer. Ms. Trittin contends that Dr. Bangura's opinion is more in line with the evidence than is Dr. Whitley's.

The Court will not reweigh Dr. Bangura's opinion against Dr. Whitley's. It was Ms. Trittin's burden to show that the ALJ's weighing of their reports is not supported by substantial evidence or is the result of legal error and she has not done so. The ALJ discussed Dr. Bangura's examination report, (R. 25-26), and then evaluated her opinion, (R. 29). The ALJ gave Dr. Bangura's opinion regarding Ms. Trittin's functional limitations "[o]nly some weight" because she found that it was not consistent with the overall record or Dr. Bangura's own findings. (R. 29.) She found that few findings were indicated to support Dr. Bangura's opinions and most of the findings were normal, which was

consistent with the normal results found by Dr. Harris, one of Ms. Trittin's treating physicians, during his examination a few months later. The ALJ concluded that Dr. Bangura's opinion apparently was based on Ms. Trittin's self-reports of limitations rather than her examination findings. The ALJ wrote that, "[t]o the extent that this was during a period of exacerbation of fibromyalgia, the frequency and intensity of the flare is not corroborated to the extent alleged and does not appear to meet the durational requirements of the Act." (R. 29.) There is no support here for Ms. Trittin's argument that the ALJ discounted Dr. Bangura's opinion simply because it was inconsistent with her predetermined RFC.

**c. Return-to-work releases.** The ALJ observed that, (1) in October 2010, Dr. Dominik, whom Ms. Trittin was seeing for treatment of her fibromyalgia, wrote in a treatment note that she "may return to work 17 Oct", (R. 352), and (2) in December 2011 and February 2012, Dr. Harris, a family-care physician who examined Ms. Trittin in those months, completed forms stating that she "will be able to return to work" in those months, (R. 29, 496, 500). The ALJ interpreted these notes to mean that neither Dr. Dominik nor Dr. Harris gave an indication of permanent work restrictions or permanent disability at the times. (R. 28, 29.)

In her opening brief, Ms. Trittin argues that the ALJ's inference was erroneous because, since she had been working only part-time beforehand, the doctors were releasing her only to the type of work that she performed before, not full-time work or substantial gainful activity. (*Brief of Plaintiff* at 14-15.) In her reply, Ms. Trittin adds the

assertion that both doctors "recognized that [she] was working part time at McDonalds. No explanation of any restriction was necessary except that she could attempt to go back to doing what she was doing." (Reply at 3.) Thus, Ms. Trittin argues that the only reasonable inference is that both doctors' releases were for part-time work and do not indicate they believed that she had no restrictions inconsistent with full-time work.

The problem with Ms. Trittin's argument is that the work releases, on their faces, are not limited to part-time work and she fails to cite evidence that the doctors were aware that she was working only part-time and that they intended to limit her to return to no more than the part-time work that she had been performing.[5] In addition, the ALJ interpreted Dr. Harris's work releases as showing only that the doctor indicated no permanent work restrictions, (R. 29), which is indisputable on their faces, and, although the ALJ inferred more from Dr. Dominik's release — *viz.*, that the doctor did not believe that Ms. Trittin was permanently disabled — Ms. Trittin has failed to show that the ALJ's inference was inherently unreasonable or otherwise unsupported by substantial evidence.

**2. Credibility.** The ALJ gave several reasons for not fully crediting Ms. Trittin's statements about the intensity, persistence, and limiting effects of her symptoms. **First**,

---

[5] Ms. Trittin did not cite evidence already in the record and neither did she obtain and submit supplemental clarifying opinions from either physician. As noted, the ALJ held open the record for, and received, additional evidence before her decision and, after receiving the ALJ's decision, Ms. Trittin submitted even more evidence to the Appeals Council.

based on Ms. Trittin's testimonial demeanor at the hearing, the ALJ found that her credibility as a witness was poor.

**Second**, the ALJ found inconsistencies between Ms. Trittin's symptom statements and the evidence of record: **(1)** she received only conservative treatment; **(2)** she testified that Dr. Dominik stated that nausea was a side effect of her fibromyalgia but treatment notes by the doctor showed only a diagnosis of resolved nausea; **(3)** the objective medical evidence did not establish that nausea is a side effect of her fibromyalgia; **(4)** Ms. Trittin testified that she had a seizure in January 2011 but follow-up CT, MRI, and EEG examinations were normal, otherwise negative, and showed no epilepsy, clear sharp waves, or spikes; **(5)** despite her many complaints, the record indicates mostly normal examination and test findings and no physician has noted overt concern about her health status; **(6)** although her fibromyalgia waxes and wanes during periods of exacerbation, the frequency and intensity of such occurrences is not corroborated to the extent that Ms. Trittin alleges; **(7)** although she testified that Dr. Dominik limited her to lifting twenty-five pounds, that limitation does not appear in the doctor's records; and **(8)** Ms. Trittin alleged breathing difficulties (asthma and C.O.P.D.) but she smoked one pack of cigarettes each day, obtained a new cat, and respiratory testing was generally normal.

**Third**, the ALJ found that Ms. Trittin was untruthful and not forthcoming with her physicians regarding her illegal drug use. **Fourth**, her reported activities of daily living

are not inconsistent with the ALJ's defined RFC.  **Fifth**, the ALJ could not rule out that

Ms. Trittin's lack of finances could be a strong impetus for her claims for benefits.[6]

S.S.R. 96-7p requires adjudicators' decisions to "contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that

weight."  A credibility finding "cannot be based on an intangible or intuitive notion about

an individual's credibility.  The reasons for the credibility finding must be grounded in

the evidence and articulated in the determination or decision."  Credibility findings may

be informed by the claimant's testimonial demeanor:

> In instances where the individual attends an administrative proceeding
> conducted by the adjudicator, the adjudicator may also consider his or her
> own recorded observations of the individual as part of the overall
> evaluation of the credibility of the individual's statements.

S.S.R. 96-7p.  However:

> In instances in which the adjudicator has observed the individual, the
> adjudicator is not free to accept or reject the individual's complaints solely
> on the basis of such personal observations, but should consider any

---

[6] Ms. Trittin also cites, as an improper credibility finding, the ALJ's inference from the lack of documentation establishing the bases for her six visits to an emergency room in March 2012 that the information "would not be  helpful to [her] case." (*Brief of Plaintiff* at 20; R. 27-28.)  Ms. Trittin argues that, although she submitted all of the records of these trips that she had, (R. 501-09), which are all that ordinarily would have been produced regarding the visits, the ALJ implied that the lack of unidentified additional documentation meant that she was trying to hide something.  The Court does not agree that the ALJ drew a negative credibility inference from the lack of additional documentation regarding the emergency-room visits.  The ALJ wrote only that she inferred that any information in the missing records would not have been helpful to Ms. Trittin's case.  Thus, although the ALJ failed to identify the nature of the records that she believed were missing and she might have been mistaken that the hospital would have produced additional documents, there is no indication that the ALJ discredited Ms. Trittin's statements on that basis.

personal observations in the overall evaluation of the credibility of the individual's statements.

*Id.*

Because an ALJ is in the best position to determine a witness's credibility, courts should not overturn such a determination unless it is patently wrong, meaning that it lacks any explanation or support. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Ms. Trittin argues that the ALJ's credibility finding is erroneous for several reasons.

**First**, regarding the ALJ's determination that she had poor testimonial credibility, Ms. Trittin argues that she was respectful, forthright, and honest during her testimony; her testimony was consistent with other witnesses and the record evidence; and the ALJ failed to provide the required specific reasons to support her determination, rendering it unreviewable. **Second**, Ms. Trittin points to physicians' statements (one, by a state-agency reviewer, and the other, by a physician to whose opinions the ALJ gave "great weight") that Ms. Trittin demonstrated her best efforts on examinations and did not engage in symptom exaggeration. **Third**, she points to the fact that no physician expressed that Ms. Trittin was lying or embellishing. **Fourth**, she argues that other witnesses — her boyfriend, Keith Wilkes, who lives with her, and a friend, Teresa Worley, who has known her for fifteen years and also has fibromyalgia and, therefore,

understands the condition — corroborated her specific testimony regarding symptom severity and functional limitations. **Fifth**, the ALJ misinterpreted her positive drug-test results and erroneously found that she lied to one of her physicians about no longer using illegal drugs. **Sixth**, her smoking and acquiring a cat are unrelated to her ability to work a full-time job due to fibromyalgia. Finally, **seventh**, the ALJ improperly equated her ability to perform activities of daily living to the ability to perform the demands of a full-time job, an example of ALJ naiveté about which the Court of Appeals has repeatedly warned. The Court addresses each of these arguments.

"Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." *Curvin v. Colvin*, ___ F.3d ___, 2015 WL 542847, *4 (7th Cir., Feb. 11, 2015). The ALJ specifically found that Ms. Trittin's testimonial credibility was poor, based on her personal observation of Ms. Trittin's testimony — "her demeanor, the way she answered questions, and all of the other factors that go into assessing a witness' credibility." (R. 26.) This type of credibility determination, based on direct personal observation, is almost impossible to find erroneous. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("An ALJ's credibility determination is entitled to deference, and we will overturn a credibility finding only if it is 'patently wrong.' . . . But when a credibility finding rests on 'objective factors or fundamental implausibilities,' rather than on a claimant's demeanor or other subjective factors, we have greater leeway to evaluate the ALJ's determination." (Citations omitted)); *Connor ex rel. I. C. v. Astrue*, No. 11-C-8736, *Memorandum Opinion and Order*,

2012 WL 6720542, *6 n. 4 (N.D. Ill., Dec. 27, 2012) ("... demeanor can rarely be effectively determined on review."). Ms. Trittin's belief that she testified respectfully and forthrightly is merely a disagreement with the ALJ's impressions, but does not show error. In addition, the ALJ gave sufficient reasons for this "demeanor" component of her credibility finding to enable review. Ms. Trittin cited no authority requiring an ALJ to catalog the multifarious and often indefinable and indescribable elements of a witness's demeanor and manner before a court may defer to the ALJ's personal observations. *See Snyder v. Louisiana,* 552 U.S. 472, 477 (2008); *United States v. Raddatz,* 447 U.S. 667, 679 (1980) ("'The most careful note ["of witnesses' prior testimony"] must often fail to convey the evidence fully in some of its most important elements. . . . It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration; . . . the dead body of the evidence, without its spirit; which is supplied, when given openly and orally, by the ear and eye of those who receive it.'" (Quoting *Queen v. Bertrand,* 4 Moo.P.C.N.S. 460, 481, 16 Eng.Rep. 391, 399 (1867))).

Ms. Trittin's reliance on physicians' opinions that she put forth her best efforts on examinations and did not exaggerate her symptoms are, in essence, credibility determinations by the physicians and, while the ALJ should, and did, consider them, she was not bound by them. The physicians' impressions do not show that the ALJ's independent credibility finding, which was based also on evidence and factors not considered by the physicians, was erroneous. Likewise, the ALJ was not bound by Mr.

Wilkes' and Ms. Worley's statements that (Ms. Trittin contends) confirm her own. The ALJ gave reasons for not fully crediting these witnesses' accounts, (R. 29),[7] and, again, her credibility finding was based on a broader base of facts and factors than these witnesses' observations were.

The Court does not find that ALJ misinterpreted the evidence regarding Ms. Trittin's drug-test results or the evidence that she was not completely honest with her physicians regarding her drug use. Ms. Trittin's arguments again improperly ask the Court to reweigh the evidence and draw different inferences than the ALJ did.

Ms. Trittin's argument that the ALJ's discounting of her statements based on her cigarette smoking and acquisition of a cat is erroneous because neither is related to her inability to work due to fibromyalgia  because the ALJ cites those facts not as direct indicators of Ms. Trittin's ability to work in general or of the severity of her fibromyalgia

---

[7] The ALJ wrote: "There is no indication that these individuals are medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, and therefore the accuracy of the statements are questionable. Moreover, by virtue of an indicated relationship with the claimant, these individuals cannot be considered disinterested third party witnesses whose statements would not tend to be influenced by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Most importantly, significant weight cannot be given to the third party statements because it, like the claimant's statements, are simply not consistent with the preponderance of the opinions and observations by credible medical doctors in this case." (R. 29.)

Ms. Trittin argues that lay witnesses, by definition, do not have medical training, yet the regulations and rules require ALJs to consider their statements, and an assumption that "interested" witnesses are not telling the truth is insupportable because witnesses who are closest to a claimant can be the best witnesses of her symptoms and limitations. However, it is evident that the ALJ did consider these witnesses' statements but she also considered factors that tended to discount their credibility. The ALJ also observed Mr. Wilkes's testimony at the hearing. Arguing that the ALJ should have given the witnesses' statements more weight than she did is asking the Court to reweigh the evidence, which the Court cannot do. It also asks the Court to not defer to the ALJ's credibility findings, which the Court will not do based solely on Ms. Trittin's argument.

in particular, but as indicators of her overall credibility and, thus, only indirect indicators of the credibility of her subjective statements regarding the functional limitations that her impairments, including her fibromyalgia, impose.

Finally, Ms. Trittin argues that the ALJ improperly equated her ability to perform activities of daily living to the ability to perform the demands of a full-time job, which the Court of Appeals for the Seventh Circuit has cautioned courts against. However, Ms. Trittin again misreads the ALJ's decision. The ALJ did not equate Ms. Trittin's activities of daily living with the ability to perform a full-time job; rather, she found that Ms. Tritten's reported activities of daily living are not inconsistent with the ALJ's defined RFC. The ALJ considered the entire record to define that RFC and to determine that there are jobs that Ms. Trittin can perform.

Ms. Trittin has not shown that the ALJ erred in her credibility finding.

## Conclusion

Because Ms. Trittin has not shown that the ALJ's decision is not supported by substantial evidence or the product of legal error, the Commissioner's denial of her claims for disability benefits will be affirmed.

**DONE this date:** 03/20/2015

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.